1   Peter C. Bronstein (CA Bar No. 153611)
    LAW OFFICE OF PETER C. BRONSTEIN
2   1999 Avenue of the Stars 11 FL
    Los Angeles, CA 90067
3   Telephone (310) 203-2249
    Email Peterbronz@yahoo.com
4

5   Attorney for Plaintiff and Creditor Berritto Enterprises LLC

6

7

8               **UNITED STATES BANKRUPTCY COURT**
9   **COUNTY OF LOS ANGELES CENTRAL DISTRICT-LOS ANGELES DIVISION**

10

11  In re:                              )   Case No.: 2:21-bk-13523 ER
                                        )   Adv. No:
12  URBAN COMMONS LLC                   )
                                        )   [Chapter 7]
13                                      )
                Debtor.                 )   **ADVERSARY COMPLAINT OF**
14                                      )   **BERRITTO ENTERPRISES LLC FOR**
    _____ )   **NONDISCHARGABLE SECTION 523**
15                                      )   **FRAUDULENT CONVEYANCE,**
                                        )   **CONVERSION, FRAUD AND**
16  BERRITTO ENTERPRISES LLC            )   **TURNOVER SECTION 549 TO**
                                        )   **DETERMINE DISCHARGEABILITY OF**
17                                      )   **DEBT SECTION 727**
                                        )
18              Plaintiff               )
                                        )
19  URBAN COMMONS LLC, Sky Holdings     )
20  LLC, Taylor Woods and Howard Wu.    )
                            Defendant   )
21  _____ )

22

23

24
                        **CHAPTER 7**
25

26                      **ADV. NO.**

27  Plaintiff Berritto Enterprises LLC (hereinafter Plaintiff or Creditor or "Berritto"") allege as
    follows:
28

COMPLAINT FOR NONISCHARABLE DEBTS AND TO DETERMINE NON-DISCHARGEABILTY OF DEBT
                                        1

## GENERAL ALLEGATIONS

### Jurisdiction and Venue

1. On April 29, 2021, an involuntary Petition was filed against Debtor and Defendant Urban Commons LLC by three creditors. The Court set a meeting of creditors for August 11, 2021, that was continued but not held. Plaintiff discovered in late September that this Bankruptcy matter was pending. Debtors have not filed any scheduled, pr any other Petition documents with this Court to Plaintiffs knowledge. The United States Bankruptcy Court has exclusive subject matter jurisdiction over the claims made and asserted herein.

2. This is an action under 11 U.S.C. §523(a)(2)(A) for a determination excepting Plaintiff's debt from discharge.

3. This Court has jurisdiction under 11 U.S.C. §523 and 28 U.S.C. §1334(b).

4. This adversary proceeding is a "core" proceeding under 28 U.S.C. §157(b)(2)(I), arising under Title 11 U.S. C. except as to Defendants Sky Holdings ,Inc., Taylor Woods and Howard Wu whom judgment should be allowed in State Court where there is a pending lawsuit.

5. This proceeding arises in the above-referenced case under Chapter 7 of the Bankruptcy Code now pending in this Court and therefore the venue is proper

6. Venue is proper in this Court under 28 U.S.C. Section 1409(a).

### Introduction

7. This case involves an investor who was defrauded by Taylor Woods, Howard Wu, Sky Holdings LLC and Urban Commons LLC (collectively "Defendants"). Defendants first created an investment scheme in which they were the only ones assured a safe and lucrative return. When this initial fraud was discovered the investor, including Plaintiff, attempted to obtain a

refund and records of the business. Debtor was facing this involuntary bankruptcy and Defendant Taylor Woods informed Plaintiff that the $1,000,000.00 he invested in Sky Holdings LLC was transferred to Debtor Urban Commons.    Defendants conspired and acted jointly to deceive Plaintiff of his $1,000,000 investment by diverting his funds to Debtor. Defendants continuously informed Plaintiff that they would refund him when they never had any intention and in fact have never refunded any funds to Plaintiff that constitutes the basis of this Complaint for fraud.

## The Parties

8. Plaintiff Berritto Enterprises LLC ("Berritto" or "Plaintiff") is and at all times relevant hereto was a limited liability company in New York,

9.  Defendant Taylor Woods ("Woods") was at all times relevant hereto a citizen of California, a resident of this judicial district and Managing Member Sky Holdings LLC. In addition to being a Managing Member of Sky Holdings LLC, Woods is a Managing Member of Debtor Urban Commons LLC as stated in the most recent Statement of information, attached hereto and hereby incorporated by reference as Exhibit A. Woods, at all relevant times, exercised both direct and indirect control over the activities of Sky Holdings LLC and Debtor Urban Commons LLC.

10. Defendant Howard Wu ("Wu") is and at all times relevant hereto was a citizen of California, a resident of this judicial district, and a Managing Member of Sky Holdings and Debtor Urban Commons LLC as stated in Exhibit A. Wu, at all relevant times, exercised both direct and indirect control over the activities of Sky Holdings LLC and Debtor Urban Commons LLC.

11. Defendant Sky Holdings LLC ( "Sky Holdings LLC") is and at all times relevant hereto was a Delaware limited liability company registered as a foreign LLC in California.

129. At all relevant times Defendant Urban Commons ("Urban Commons" or "Debtor") was a California Limited liability Company.

## **FACTUAL BACKGROUND**

13.    In or about January of 2021 Plaintiff was introduced by an associate to Taylor Woods, of Sky Holdings, LLC.  Mr. Woods discussed investing in Sky Holdings, LLC.

14.    On or about January 2021 Plaintiff received several items from Mr. Woods including but not limited to an Investment Agreement, attached hereto and hereby incorporated by reference as Exhibit B.  The investment agreement dictated that Plaintiff would own an investment in Sky Holdings, LLC, and a Delaware Limited Liability Company doing business in California.

15.  On February 5, 2021, Plaintiff invested $1,000,000 in Sky Holdings, LLC as described in the wire attached hereto and hereby incorporated by reference as Exhibit C that was deposited into Sky Holdings LLC at an account housed at East West Bank at the direction of Defendant Taylor Woods.

16.  The purpose of Sky Holdings, LLC was specifically to "**acquire**, own, operate, and eventually sell a 50.000% share of the equity of EHT (Eagle Hospitality Trust, a public lodging REIT), which will become privatized as a part of this investment process, and which consists of an eighteen-hotel U.S. portfolio of properties (the "**Property**") as stated in Exhibit C paragraph (1) (d). In fact, the Agreement specifically states that the funds raised would be "directly" used for this purpose.

17  Plaintiff's funds were to be "deposited into an interest-bearing secure bank account." Plaintiff believes the funds were either comingled or used for other purposes then as described in the investment agreement.

18 Plaintiff and Defendants Agreement specifically states that "If this transaction is not completed, all funds raised by the Company will be returned to the applicable

investors, together with any interest remaining on such funds following the payment of costs and expenses" in Exhibit C paragraph (1)(f).

19 Defendants Howard Wu and Taylor Woods were named as Managers of the company both in the investment agreement (see paragraph (1) (i) and the Operating Agreement of the Defendant, attached hereto and hereby incorporated by reference as Exhibit D.

20 Pursuant to the Operating Agreement the registered agent and main office for the Defendant Sky is 10250 Constellation Boulevard, Suite 1750, Los Angeles, California 90067 in Section 1.4 of the Operating Agreement.

21 Pursuant to the Operating Agreement, Howard Wu and Taylor Woods are the Managing members of the company in paragraph 3.1 of the Agreement.

INVESTMENT

22 The purpose of Plaintiffs investment was to purchase 18 distressed hotels from EHT (Eagle Hospitality Trust, a public lodging REIT) which never occurred. Over time, Defendant Taylor Woods changed the story.

    a. At the time of Plaintiff's initial investment, Defendant Wood represented to Plaintiff that the transaction would close "in a few weeks".

    b. On February 21, 2021, via text, Defendant Woods told Plaintiff that Defendant Woods would "update Plaintiff".

    c. On April 16, 2021, Plaintiff reached out again to Defendant Woods requesting why there was no update. Defendant Woods informed Plaintiff that "all the capital was put in place" and that things were moving forward well. Defendant Woods informed Plaintiff that closing was expected in

mid-May 2021.

d. On May 13, 2021, Plaintiff contacted Defendant Woods and again Defendant Woods stated, "everything is going in on Friday" and Defendant Woods represented to Plaintiff "felt good about it".

e. Plaintiff heard nothing for another month from any Defendant. Plaintiff left a message with Defendants on June 16, 2021. Defendant Woods replied on June 18, 2021, that there was "potential for a smaller deal" and we needed to talk.

f. Plaintiff and Defendant Woods spoke on June 25, 2021, and Defendant Woods told Plaintiff and one fellow investor that only four out of 18 properties remained. Plaintiff informed Defendant Woods that Plaintiff was not comfortable. Defendants agreed to send Plaintiff 1) Evidence of where the Sky Holdings LLC funds went 2) a pro forma capital table, sources and uses of funds and 3) a description of the four (4) remaining properties.

g. On or about June 29, 2021, Plaintiff sent an email to Defendants since Plaintiff I didn't receive anything, and Plaintiff listed the items Defendants promised and reminded the Defendant to furnish information.

h. On or about July 17, 2021, Plaintiff had received no information from Defendants and Plaintiff sent Defendant an email, attached hereto and hereby incorporated by reference as Exhibit E demanding the return Plaintiffs funds in the amount of $1,000,000.00.

i. On or about July 19, 2021, Defendant Taylor Woods promised to return Plaintiff's investment and that Defendant Woods would have a friend

"replace my equity" referring to Plaintiff as me.

j. On or about July 30, 2021, Plaintiff received nothing from Defendants and reached out again. Plaintiff has received no response and reached out again on August 4, 2021, August 9, 2021, and August 11, 2021, but has not received any responses from Defendants.

23 Plaintiff has consistently requested the return of Plaintiffs investment, but it has not been returned despite repeated representations from Defendant.

24 Defendant Woods has offered excuse after excuse. Plaintiff has offered for third parties to buy Plaintiff out, and Defendants offered Plaintiff other security positions, but will not return Plaintiff's investment.

25 Plaintiff has requested proof from the Defendant as to his investment. Plaintiff received one email with a PDF of what Defendant Woods said was a deposit to "the court" for purchase of the EHT interest. What Defendant Wood attached is a report **not** from Sky Holdings LLC, but from "Urban Real Estate" showing a wire to a third party on May 17, 2021. Plaintiffs' investment into Sky Holdings LLC was not held in an account owned by Sky Holdings but transferred elsewhere by the Managers into an account held by "Urban Real Estate". In violation of the Sky Holdings LLC Operating agreement, Plaintiff's money was moved and transferred.

26 Plaintiff has demanded the return of monies both orally and in writing by counsel and have been ignored as described in the letters, attached hereto and hereby incorporated by reference as Exhibit F.

27 Upon information and belief and based upon the Defendant's deposit report monies

were deposited from Defendants into another entity named Urban Commons LLC, the debtor in this case.

28 Taylor Woods and defendants have represented to Plaintiff that the $1,000,000 in funds were transferred to Debtor Urban Commons LLC's bank account.

## FIRST CAUSE OF ACTION
(For Actual and Intentional Fraudulent Conveyance Against Defendants - Civ. Code § 3439.04(a)(1) - Cash Transfers)

29. Plaintiff, realleges and incorporates herein by this reference paragraphs 1 through 28, above, as if specified here.

26. Plaintiffs informed and believes and thereon alleges that Defendants and each of them or in concert made the Cash or Cash Equivalent Transfers to other entities or the other Defendants (collectively, the "Cash Transfers") with actual intent to hinder, delay, or defraud investors, or shareholders including but not limited to Plaintiff, all in violation of Civil Code Section 3439.04(a) (1) and also Penal Code section 531.

27. The Court should: (a) set aside, annul, and/or declare each of the Cash Transfers void to the extent necessary to satisfy the monies invested by Plaintiff plus damages; (b) award damages to Plaintiff against Defendants; (c) enjoin further disposition of the total sum of the Cash Transfers until such time as the Plaintiff is paid in full for his investment plus damages; and/or (d) issue a mandatory injunction requiring Defendants, to forthwith turn over and deliver all of the cash invested plus damages from whomever received the funds.

## SECOND CAUSE OF ACTION
(Conversion Against Defendants under section 523)

28. Plaintiff, realleges and incorporates herein by this reference paragraphs 1

through 27 above, as if specified here.

29.    At all times herein mentioned, and in particular on and before August 2021, Plaintiff was, and still is, the owner of and was, and still is, entitled to the possession of the $1,000,000.00 funds.

30.    Plaintiffs are still entitled to the payment of the specific sum of $1,000,000.00 that was provided for a specific purpose namely a property development and on information and belief used for other purposes.

31.    On or about February 2021, the aforementioned Defendants took the monies described above from Plaintiffs' possession and converted the same to their own use by stating the funds would be used for a property development but was used for unknown purposes and transferred from Defendant Sky Holdings to Debtor Urban Commons or other entities under the control of Defendants.

32.    On and after August 2021, Plaintiffs orally demanded the immediate return of the funds improperly used by Defendants, but the aforesaid Defendants failed and refused, and continue to fail and refuse, to return the monies to Plaintiffs.

33    Pursuant to California Civil Code, §3336, the detriment caused by the wrongful conversion of personal property is presumed to be the value of the property at the time of the conversion, plus interest from the time of conversion. Plaintiff has been damaged in that amount. Pursuant to California Constitution, art. XV, Section 1, the interest allowable under the statute is the legal rate of interest of ten (10) percent per annum.

34.    Between the time of the aforesaid Defendants' conversion of the above-mentioned property to their own use and the filing of this action, Plaintiffs properly expended time and money in pursuit of the converted property, all to Plaintiff's further damage in a sum

according to proof.

35.     The aforesaid Defendants' acts alleged above were willful, wanton, malicious, and

oppressive, were undertaken with the intent to defraud, and justify the awarding of

exemplary and punitive damages according to proof.

### THIRD CAUSE OF ACTION
### (FRAUD UNDER SECTION 523)
### (AGAINST All DEFENDANTS)

36.     Plaintiff realleges and incorporates by reference Paragraphs 1-35 above as though

set forth herein in full.

37.     Defendants represented to Plaintiff that Defendants would be used for

development of property and not transferred out of the company for other purposes .

38.     When Defendants made his representation to Plaintiff that they would use the

funds to develop property they knew the statement was false.

39.     Plaintiff entered into an agreement with Defendant Sky Holdings believing the

funds would be used to develop property and not to be transferred to others with funds

being used for unknown purposes if any purpose.

40.     DAMAGES.  As the proximate result of Plaintiff's reliance upon the

misrepresentations by Defendants, which reliance was justified, Plaintiffs have been

damaged in excess of $1,000,000.

### FOURTH CAUSE OF ACTION
### AGAINST URBAN COMMONS
### TURNOVER UNDER SECTION 542

41.     Plaintiff realleges and incorporates by reference Paragraphs 1-40 above as though

set forth herein in full.

42. Bankruptcy Code Section 542 requires an entity other than a custodian, in possession,

custody or control, during the case, of property that the trustee may use, sell or lease to deliver the property to the trustee and account for the property unless the property is of inconsequential value to the estate.

43.. Defendant is a person in possession of the Funds who is required to render an accounting for, and to turnover, the Funds.

44. Plaintiff has made demand upon Defendant for turnover of the Funds. Defendant has failed and refused to surrender the funds or to render an accounting; accordingly, Plaintiff is entitled to interest, attorney's fees and costs of court of and from the Defendant.

45. Specifically Debtor received One million dollars from Plaintiff without any consideration to Defendants nor Plaintiff.

### FIFTH CAUSE OF ACTION
### AGAINST URBAN COMMONS
### DENIALOF DISCHARGE PURSUANT TO SECTION 727

46.     Plaintiff realleges and incorporates by reference Paragraphs 1-45 above as though set forth herein in full.

47.     Debtor has not filed schedules as of today and the 341(a) meeting was scheduled August 11, 2021. Plaintiff only recently discovered a bankruptcy was even filed. Plaintiff has no way to discern what transpired without the schedules or statement of financial affairs and was never listed as a creditor

48. Debtor's above stated actions constituted an intent hinder, delay, or defraud a creditor including, but not limited to, Berritto Enterprises LLC or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the estate, after the date of the filing of the petition.

49.   The Debtor's above-stated actions constitute a knowingly and fraudulent intent in connection with the case a false oath or account. In re Olson, 916 F.2d 481, 483-84 (8th Cir. 1990) (debtor shall not be discharged if he knowingly and fraudulently made a false oath or account in connection with his petition); In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984) (failure to list securities on his bankruptcy schedules constituted a false oath knowingly and fraudulently made and barred a discharge);  In re Wiener, 208 B.R. 69 (9th Cir. BAP 1997), reversed on other grounds, 161 F.3d 1212 (9th Cir. 1998).

50.   All of the  Corporate Debtor's actions, as set forth above, constituted "bad faith," which has harmed the estate and its creditors, thereby entitling the Court to sustain Plaintiff's objection to the granting of a discharge to the Debtor or the denial of a discharge for cause.

### PRAYER

WHEREFORE, the Plaintiff prays for relief as follows:

1. A judgment sustaining Berritto's objection to the granting of a discharge to the debtors, a discharge, pursuant to Title 11 U.S.C, § 1141 and incorporated § 727.

2. A non-dischargeable judgment in favor of Berritto Enterprises LLC against the debtor. , declaring Urban Commons's debt to be nondischargeable, pursuant to Title 11 U.S.C. § 1141 and incorporated § 523.

3.  Immediate return of $1,000,000.00 to Berritto Enterprises as Defendant Sky Holdings had no right to transfer funds and such sums should not be part of the Bankruptcy estate

4. Reasonable attorney's fees, including those incurred prepetition.

5. Costs of the complaint herein.

6. For a determination of claims and judgment for compensatory damages, punitive damages, and pre judgment interest; and

7. For such other and further relief as the Court may deem just and proper including, but not limited to, the retaining of jurisdiction to enforce it orders or judgment and prohibiting the filing of any future bankruptcy petition by the debtors, and/or their alter-ego entities. Kokonen v. Guardian Life Ins. Co. of America, 114 S.Ct. 1673, 1676 (1994) (The court has jurisdiction to enable it to vindicate its authority and effectuate its decrees); In re Carraher, 971 F.2d 327, 328 (9th Cir. 1992) (discretion to retain jurisdiction); In re Clark, 223 F.3rd 859 (8th Cir. 2000) (Section 105 broadly empowers the court to prevent an abuse of the bankruptcy process); Section 105; See In re Tomlin, 105 F.3d 922 (4th Cir. 1997); In re Fitzsimmons, 920 F.2d 1468 (9th Cir. 1989).

7.  Turnover of $1,000,000 plus interest received from other Defendants by Debtor

8.  Requirement that Debtor file all petitions and schedules immediately and produce accounting records for transactions involving Defendants and Debtor.

DATED: October 6, 2021

By: _____
Peter Bronstein, Attorney for
Plaintiff Berritto Enterprises LLC

# EXHIBIT A

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

| LLC-12 |

19-E58230

# FILED

In the office of the Secretary of State
of the State of California

DEC 09, 2019

**IMPORTANT** — Read instructions **before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

This Space For Office Use Only

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

URBAN COMMONS, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 200828010052 | DELAWARE |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |
| b. Mailing Address of LLC, **if different than item 4a**<br>10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box<br>10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Howard | | Wu | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** — Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Taylor | | Woods | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |

**CORPORATION** — Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) - Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| real estate investment |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 12/09/2019 | Taylor Woods | Member | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name: ⌐

Company:

Address:

City/State/Zip: ⌐

**Attachment to
Statement of Information**
(Limited Liability Company)

**LLC-12A
Attachment**

19-E58230

**A.   Limited Liability Company Name**

URBAN COMMONS, LLC

This Space For Office Use Only

**B.   12-Digit Secretary of State File Number**

200828010052

**C.   State or Place of Organization** (only if formed outside of California)

DELAWARE

**D.   List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address.   If the manager/member is an entity, enter the entity's name and address.  Note:  The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Taylor | | Woods | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| 10250 Constellation Blvd., Suite 1750 | Los Angeles | CA | 90067 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |
| Entity Name | | | |
| Address | City (no abbreviations) | State | Zip Code |
| | | | |

EXHIBIT B

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

## SKY HOLDINGS, LLC
### MEMBERSHIP INTEREST SUBSCRIPTION AGREEMENT

TO:    Sky Holdings, LLC

I hereby irrevocably offer to purchase a membership interest (the "Interest") in Sky Holdings, LLC, a Delaware limited liability company (the "Company"), for a purchase price of $ **1,000,000**__, upon the terms and conditions described below.  The membership interest shall be calculated using my capital contribution divided by the total capital contribution of $30,000,000, which shall result in an ownership percentage of __**3.333**__%, and which shall represent 50% of the equity.  I agree to pay the balance of the purchase price for the Interest to the Company not later than February 4, 2021.  I will deliver to the Company the purchase price for the Interest in the manner set forth in Section 14 below.

I understand that the Company may terminate this offering at any time, that the Company, in its discretion, may accept or reject my subscription, provided that notification of such rejection must be given to me within 15 days after this Agreement, properly completed and signed by me, and full payment of the purchase price for the Interest is delivered to the Company, and that, if there is such rejection notification, the purchase price will be promptly returned to me without interest.  The Company anticipates completing this offering by February 18, 2021.

I understand the funds raised from this offering will directly be used to acquire, own, operate, and eventually sell an eighteen-hotel portfolio of properties (the "Property").  I further understand that (i) the purchase price will be deposited into an interest-bearing secure bank account and (ii) any interest earned on such account may be used by the Company toward costs and expenses (including, but not limited to, legal, accounting and asset management costs and expenses) incurred in connection with this offering and the formation of the Company.  The initial membership interests of the members will be reflected in the Operating Agreement for the Company.  If this subscription is terminated, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of all costs and expenses.

I understand the Company is obtaining acquisition loans in an aggregate amount of approximately $475,000,000 in order to acquire the Property.

I understand that the terms of the Interest and related agreements are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to me.  The Company's acceptance of my subscription will be conditioned on my entering into the Operating Agreement and agreeing to be bound by all of its terms.  I understand that the Operating Agreement for the Company will name Urban Commons, LLC as manager of the Company (the "Managers") with exclusive authority and control over all Company decisions in entering into and managing Company strategy, direction and investments.

I understand that the purchase of the Interest involves certain risks, including, but not limited to, the risks identified on the **Schedule of Investment Risks** attached to this Agreement.  I have carefully read and considered these risks before making this offer to purchase the Interest.

In connection with my subscription for and purchase of the Interest, I hereby represent and warrant to the Company and agree as follows:

1.    I am acquiring the Interest for my own account for investment and not with a view to or for sale in connection with any distribution of the Interest.

2.    In making this investment, I am relying upon my own investigation and analysis and have determined that the Interest is a suitable investment for me.  The Company has made available to me information, and the opportunity to question its representatives, concerning the terms of this offering and the proposed investment of the Company in various real investments.  I have been furnished with such information as I have requested.  It has never been guaranteed or warranted by the Company, or any person connected with or acting on the Company's behalf, that I will be able to sell or liquidate the Interest in any specified period of time or that there will be any particular profit to be realized as a result of this investment.  I have adequate means to provide for my current and expected financial needs and reasonable contingencies, can bear the economic risks (including a complete loss of the purchase price) associated with my purchase of the Interest and have no need for liquidity in this investment.

3.    The Company has advised me that the Interest is not being registered under the Securities Act of 1933, as amended (the "1933 Act"), in reliance upon the exemption from the registration requirements provided by Section 4(2), Rule 506 of Regulation D and/or Regulation S under the 1933 Act, and are not being qualified or registered under any state securities laws in reliance upon applicable exemptions from the qualification and registration requirements.  I understand that no federal or state agency has made any finding or determination as to the fairness of this investment, nor any recommendation or endorsement of the Interest.  I understand that the Company is relying in part on my representations set forth in this Agreement for purposes of claiming such exemptions.  I understand the Company is under no obligation to register the Interest on my behalf.

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

4.    I agree that I, and any transferees of the Interest, shall be bound by the restrictions on transfers of the Interest which are described in this paragraph or are otherwise applicable under federal or state securities laws. I also understand that any certificate representing the Interest will bear a legend substantially in the following form, and any legend appropriate to comply with applicable state securities laws, which I agree to abide by:

"THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AND MAY NOT BE SOLD, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS DULY QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, BASED ON AN OPINION OF COUNSEL OR OTHER EVIDENCE SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION ARE NOT REQUIRED."

I agree that stop transfer instructions prohibiting transfers of the Interest may be filed in the Company's records or issued to the Company's transfer agent as a means of preventing the sale or disposition of the Interest in violation of the restrictions and legends set forth in this paragraph above and that any transfer of the Interest or any portion thereof causing such a violation shall be void.

5.    The offer to sell the Interest was directly communicated to me by direct communication with the Company's director(s), officer(s) or manager(s), and I was not presented with or solicited by any leaflet, public promotional meeting, television advertisement or other form of general advertising. (FILL IN THE FOLLOWING) I am a citizen of _____N/A_____ or, if I am an entity, I was formed and exist under the laws of ____Delaware_____.

6.    I have a substantial preexisting personal or business relationship with the Company's management personnel and/or, by reason of my business or financial experience, or the business or financial experience of my management if I am an entity, am capable of evaluating the merits and risks of my purchase of the Interest and have the capacity to protect my interests in connection with this investment.

7.    I am an "Accredited Investor," as defined in Rule 501(a) of Regulation D under the 1933 Act, as follows (CHECK EACH APPLICABLE BOX--AT LEAST ONE MUST BE APPLICABLE AND CHECKED):

[ ]    (a)    I am a natural person whose individual net worth, or joint net worth with my spouse, including the estimated net fair market value of my principal residence, presently exceeds $1,000,000; and/or

[ ]    (b)    I am a natural person who had individual income, without that of my spouse, in excess of $200,000 in each of the two most recent years and reasonably expects to have income in excess of $200,000 in the current year; and/or

[ ]    (c)    I am a natural person who had joint income with my spouse in excess of $300,000 in each of the two most recent years and reasonably expects to have such joint income in excess of $300,000 in the current year; and/or

[X]    (d)    I am (circle which one) a corporation, partnership, limited liability company, or organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000; and/or

[ ]    (e)    I am a trust, not formed for the specific purpose of acquiring the Interest, with total assets in excess of $5,000,000 whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this prospective investment); and/or

[ ]    (f)    I am any of the following (CIRCLE WHICH ONE): a bank (as defined in Section 3(a)(2) of the 1933 Act), or a savings and loan association or other institution (as defined in Section 3(a)(5) of the 1933 Act), whether acting in an individual or fiduciary capacity; or a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; or an insurance company (as defined in Section 2(13) of the 1933 Act; or an investment company registered under the Investment Company Act of 1940; or a business development company (as defined in Section 2(a)(48) of the Investment Company Act of 1940; or a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Administration Act of 1958; or a plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary (as defined in Section 3(21) of such Act), which is either a bank, savings and loan association, insurance company or registered investment adviser or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; and/or

2

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

[ ]      (g)      I am an entity in which all of the equity owners are Accredited Investors.

8.      (CHECK THIS BOX IF APPLICABLE:      [ ]) The offer to sell the Interest was not made to me by the Company or its agents while I was in, and I have made this offer to buy the Interest and signed this Agreement when I have been outside of, the United States of America (which for purposes of this Agreement includes all of its states, territories and possessions and the District of Columbia).

9.      The information set forth in this Agreement is correct with respect to me as of the date of my execution of this Agreement. I will promptly notify the Company of any change in such information occurring before I am notified of the acceptance of my subscription by the Company and will provide any further supplementary information, which is requested by the Company.

10.      I hereby agree to indemnify the Company and its officers, directors, managers and agents against, and hold such parties harmless from, any and all liabilities, damages, costs or expenses, including, without limitation, those arising under federal or state securities laws, incurred on account of or arising out of: (a) any inaccuracy in my representations and covenants set forth herein; or (b) the disposition of any of portion of the Interest which I will receive, contrary to my foregoing representations and covenants.

11.      If a corporation, partnership, trust, limited liability company or other form of business entity, I am authorized and otherwise duly qualified to purchase and hold the Interest and have not been formed for the specific purpose of making an investment in the Company. If an undersigned individual is executing this Agreement, as well as all other related documents, on behalf of any entity, such individual represents that he or she is duly authorized to execute all such documents on behalf of that entity. If an individual, I am under no legal disability with respect to entering into this Agreement or purchasing the Interest.

12.      At the Company's request, I will promptly execute such other instruments or documents as may be reasonably required in connection with my purchase of the Interest. Whenever the context hereof so requires, use of either the masculine, feminine or neuter shall include the masculine, feminine and neuter, and use of the singular or the plural form shall include the singular and plural. This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding conflict of laws provisions. In any dispute or legal proceeding relating to the enforcement of rights under this Agreement, the prevailing party shall be entitled to recover its reasonable legal fees and costs. This Agreement constitutes the entire agreement between me and the Company, and supersedes any prior or contemporaneous representations, warranties, understandings or agreements, with respect to the subject matter of this Agreement. Neither this Agreement nor any provision hereof may be amended, waived or canceled except by an instrument in writing signed by the party against whom any such amendment, waiver or cancellation is sought. Any provision of this Agreement which is invalid or unenforceable under applicable laws shall be deemed inoperative to the extent it conflicts with such laws, but shall not affect the enforceability of other provisions of this Agreement. No waiver of any of the provisions of this Agreement shall be deemed a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver.

13.      This Agreement shall be binding upon my heirs, executors, administrators, successors and assigns. However, my rights and obligations to purchase the Interest under this Agreement may not be assigned or transferred to any other person without the Company's prior written consent and any assignment or transfer in violation of this paragraph shall be void.

14.      The purchase price for the Interest will be paid in the form of a (wire, check, transfer, etc): _____.

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

DATED: _____2/3/2021_____


Printed Name of Purchaser (if an individual):          Signature of Purchaser (if an individual):

Berrito Enterprises LLC  MANGING MEMBER: Frank Berritto  *Berrito Enterprises LLC MANGING MEMBER: Frank l*
_____                         _____
                                                       988C5A944CE243C...

Printed Name(s) and Title(s) or          Signature(s) of Any Officer(s),
Capacity(ies) of any Officer(s)          Partner(s) or Agent(s) Acting
Partner(s) or Agent(s) Acting on         on Behalf of Purchaser (if an entity):
Behalf of Purchaser (if an entity):

Name: __Berrito Enterprises LLC__        Signature: _____

Title: __Managing Member__

4

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

## ADDITIONAL INFORMATION

**COMPLETE EACH ITEM. MODIFY AS APPROPRIATE IF THERE ARE TWO OR MORE PURCHASERS. ADD ADDITIONAL SHEETS IF NECESSARY TO COMPLETE ANY OF THE ITEMS.**

1.  Give the exact name(s) in which title to the Interest is to be taken:

    Berrito Enterprises LLC

Indicate the type of ownership [check one]:

[ ] Individual ownership  (One signature required)

[ ] Trust (Include name of trustee(s) and date trust was established)

[X] Partnership (Include copy of the statement of partnership or the partnership agreement or certificate authorizing signature)

[ ] Corporation (Include certified corporate resolution authorizing purchase and signature)

[ ] Joint Tenancy (Both parties must sign)

[ ] Community Property (Spouse or spouses named as record holder(s) must sign)

[ ] Tenants in Common (Both parties must sign)

[ ] Other:_____

2.  If the purchaser is other than an individual purchasing for his or her own account (a corporation, trustee, partnership, custodian, estate, etc.), indicate the nature of the purchaser and the capacity of any person(s) signing above on behalf of the purchaser:

    _____
    _____

3.  Residence address of purchaser or principal business address (if an entity):

    11 Danton Lane N, Lattingtown, NY 11560

4.  Mailing address (if different than residence address) to be used for notices from the Company:

    _____

5.  Telephone numbers:

    Business:        (____) _____

    Residence:       (____) _____

    Facsimile:       (____) _____

6.  Tax ID Number (Social Security Number if an individual):___27-4257944_____

7.  E-Mail Address:_____fberritto@gmail.com_____

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

## ACCEPTANCE BY THE COMPANY

SKY HOLDINGS, LLC hereby accepts the foregoing agreement and agrees to be bound by its provisions.

DATED:    2/3/2021

SKY HOLDINGS, LLC,
a Delaware limited liability company

By: _____
Signature

Taylor Woods
_____
Printed Name

Manager
_____
Title

6

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

## SCHEDULE OF INVESTMENT RISKS

### General Risks

**The Company is a newly-formed entity with no operating history.** Investors will be relying on the judgment and efforts of Urban Commons, LLC, Howard Wu and Taylor Woods (the "Managers") to manage the business and affairs of the Company. No investor should purchase Interests in the Company unless such investor is willing to entrust all such aspects of management to the Managers.

**The Company cannot assure that an investment in Company Interests will generate any specific rate of return or any return at all.** In addition, the performance of the management in previous investments unrelated to this subscription is not necessarily indicative of future results. An investor may lose such investor's entire investment in the Company.

**Projections are inherently inaccurate.** The projections prepared with respect to the financial performance and operating results of the Company are based, in part, on projections made by the Managers and other parties. Projections are only estimates of future results and are based on assumptions made at the time the projections are developed. While the Manager believes that the assumptions are reasonable based on the experience of the Manager's principals, the Manager cannot assure that the results set forth in any projections will be attained, and actual results may be significantly different from the projections.

### Conflicts of Interest

**The Managers and its affiliates will continue to engage in other activities, some of which may compete directly with the Company.** This may result in direct competition among the Managers and the Company. It is anticipated that the Company, the Managers, their affiliates and principals will provide a significant portion of business management decisions for the Company. While the contracts among such parties will include rates and terms that the parties believe are customary in the market, the Managers, the Company and their affiliates likely will manage businesses in competition with the Company. Accordingly, the Managers, the Company and their affiliates may face a conflict of interest in certain specific business decisions.

**The Company may pay fees for services from its affiliates.** The Company may engage affiliates of the Company, including the Managers, to perform certain services for which fees are customarily charged in connection with standard business transactions. The compensation for such services is believed to be comparable to the compensation that would be charged by qualified independent parties providing similar services in the same market pursuant to arm's-length negotiations, and the Company will disclose the engagement of any affiliate to the investors.

**The Managers will be subject to various other conflicts of interest arising out of its relationship with you and the other Members.** The principals of the Managers and their affiliates are employed independently of this offering and are engaged in other activities. The principals of the Managers and their affiliates will have conflicts of interest in allocating time, services and functions among various existing enterprises and future enterprises. The Managers and its affiliates may organize other business ventures that may compete directly with the Company. Further, the Managers and affiliates with common ownership and management personnel may result in material conflicts of interest to the possible detriment of the Members.

**The Company's attorneys do not represent any of the investors.** The Company, the Managers and their affiliates generally will be represented by the same legal counsel, and such counsel will not be acting on behalf of the investors. Investors are encouraged to consult their own legal counsel and other advisers in determining the consequences of purchasing the Interests. The legal counsel representing the Company, the Managers and their respective affiliates does not represent, and will not be deemed under the applicable codes of professional responsibility to have represented or to be representing, any or all of the investors.

**Each Member's return on investment (if any) will be directly related to the economic success of the Company.** The results of operations of the Company will be subject to those risks typically associated with investments in businesses. Fluctuations in economic drivers can adversely affect operating results and Company performance.

### Membership Risks

**Your ability to dispose of your Interests may be materially limited.** You should view your investment in the Company as illiquid. If you anticipate having a need during the term of the Company for the money you invest, then you should not invest in the Company. You will have limited rights of redemption, which will be subject to the Managers' discretion. Your Interests will not be transferable without the prior written consent of the Managers, which the Managers may withhold or grant in its discretion. Transfers of Interests also will be limited under the Operating Agreement with respect to applicable securities and tax laws. In addition, there currently is no market for the Interests, and it is highly unlikely that a market for the Interests will develop. Although Interests may be offered to other Members of the Company, redeemed by the Company or offered through proper securities channels, the market value

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

of Interests (if any) would depend on the performance of the Company, the general economic environment and market demand. Thus, it is unlikely that you will be able to liquidate your Interests in the event of an emergency, and, even if you could do so, the price you may receive for your Interests likely would depend on many factors and could be at a substantial discount to the amount you paid for your Interests, the Company's asset value or other criteria of value for the Interests. Also, it is unlikely that the Interests will be readily acceptable as collateral for loans.

**You must rely on the Managers to manage the Company and its business and operations.** The Company's operations will be managed exclusively by the Managers, which has experience in sponsoring companies similar to the Company. However, the past performance of the Managers, its principals and any of their previous Companies or investments is not, nor should it be construed as, an indication or guarantee of how the Company will perform. You will not have any right to participate in the management of the Company or its business, and you should not purchase Interests unless you are willing to entrust all aspects of the Company's management to the Managers.

The Company believes that the continuing services of the Managers are essential to the Company. If the Managers should withdraw or be removed as the Managers of the Company, become bankrupt or otherwise cease business operations, and you and the other Members desire to continue the Company or management of the Company, then a capable successor would have to be elected. In that event, you and the other Members may not be successful in finding other persons to manage the business affairs of the Company on terms acceptable to you and the other Members.

**You will have limited voting rights.** Unlike a holder of common stock in a corporation, as a Member you will have only limited voting rights on matters affecting the Company. The Managers will have sole management control over the Company, and you and the other Members will have no right to elect the Managers on an annual or any other basis. The Manager may be removed only for cause by the Members.

**Your ability to bring an action against the Managers is limited by the Operating Agreement.** The Operating Agreement provides that neither the Managers nor any of its affiliates will have any liability to the Company or to you and the other Members for any loss the Company suffers arising out of any action or inaction of the Managers or an affiliate, if the Managers or the affiliate determined, in good faith, that the course of conduct was in the Company's best interests, and the course of conduct did not constitute gross negligence or willful misconduct on the part of the Managers or gross negligence or willful misconduct on the part of the Managers' affiliate. As a result of these provisions in the Operating Agreement, your right to bring an action against the Managers and its affiliates will be more limited than it would be absent these provisions.

**Risks Relating to Private offering and Lack of Liquidity**

**Risks Relating to the Subscription Agreement.** By entering into the Subscription Agreement, an investor will agree to indemnify the Company, the Managers and certain of its related parties from all losses associated with the investor's failure to fulfill all of the terms and conditions of the Subscription Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties, covenants or agreements contained in the Subscription Agreement or in any other document that the investor has furnished to any of the foregoing in connection with this offering. Investors should read the Subscription Agreement carefully before deciding to invest.

**Private offering - Lack of Agency Review.** Since this offering is a nonpublic offering and, as such, is not registered under federal or state securities laws, investors will not have the benefit of review of this Memorandum by the Securities and Exchange Commission or any state securities commission. The terms and conditions of this offering may not comply with the guidelines and regulations established for business programs that are required to be registered and qualified with those agencies.

**Private offering Exemption - Compliance with Requirements.** The Interests are being offered to investors and will be sold to investors in reliance on a private offering exemption from registration provided in the Securities Act of 1933, as amended. If the Company fails to comply with the requirements of such exemption, then the investors would have the right to rescind their purchase of the Interests if they so desired. It is possible that one or more investors seeking rescission could succeed and negatively impact the Company, the Managers or its affiliates. This also might occur under the applicable state securities or "Blue Sky" laws and regulations in states where the Interests will be offered without registration or qualification pursuant to a private offering or other exemption.

**Dilution as a Result of Additional Capital Contributions.** Members are not obligated to make additional capital contributions to the Company beyond their initial capital contribution. However, from time to time circumstances could arise under which the Company may require additional capital in order to operate the Company. In such circumstances, the Managers may request that each Member contribute additional capital to the Company *pro rata* in accordance with such Member's percentage ownership of the Company. If a Member does not contribute its *pro rata* share of additional capital to the Company and other Members do, then such Member's economic interest in the Company will be diluted and could be eliminated.

**Tax Risks**

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

**General.** There are risks associated with the federal income tax aspects of a purchase of Interests. The income tax consequences of a purchase of Interests are complex, and recent tax legislation has made substantial revisions to the Code. The following paragraphs summarize some of the tax risks to an investor. Because the tax aspects of this offering are complex and certain of the tax consequences may differ depending on individual tax circumstances, prospective investors are urged to consult with and rely on their own tax advisers about this offering's tax aspects and their individual situations. No representation or warranty of any kind is made with respect to the IRS' acceptance of the treatment of any item by an investor.

**You must report your share of the Company's tax items on your personal tax returns.** The Company has been formed as a California limited liability company, and for federal tax purposes a limited liability company is not a taxable entity. Thus, you and the other Members must report on your own federal, state and local income tax returns your respective share of all items of income, gain, loss, deduction, credit (if any) and alternative minimum tax preferences or adjustments generated by the Company each year, whether or not you receive any cash distribution from the Company that year.

**The Company will not apply for an advance ruling from the IRS as to any federal tax consequence of your investment in the Company.** The Company will not apply for an advance ruling from the IRS as to whether or not for federal tax purposes the Company will be treated as a partnership, instead of being taxed as a corporation, or with respect to any other tax consequence to the Company from its intended activities or to you from your investment in the Company. Thus, if the Company's annual information income tax return is audited by the IRS, the IRS may disagree with one or more of the tax positions taken by the Company.

**Your taxes on your share of the Company's income may exceed your cash distributions from the Company.** You will be required to pay federal income taxes on your allocable share of the Company's taxable income, if any, whether or not you receive cash distributions from the Company. Your cash distributions from the Company in any year may be less than your allocable share of the Company's taxable income in that year or even less than your tax liability resulting from that income.

**Your ability to deduct losses from the Company may be limited.** Your ability to deduct your share of tax losses generated by the Company may be limited by your "at risk" amount in the Company at the end of each taxable year, the amount of your adjusted basis in your Interests at the end of each taxable year and the passive activity limitations on losses under the Internal Revenue Code (the "Code"). Your passive loss from the Company in any taxable year cannot be used by you to offset your active income (*e.g.,* salary, bonuses, *etc.*) or your portfolio income (*e.g.,* dividends, interest income, *etc.*) from the Company or any of your other investments.

**A portion of your cash distributions from the Company may be taxable.** Distributions from the Company to you in excess of your share of the Company's taxable income, if any, will reduce your adjusted tax basis in your Interests. In addition, any cash distributed to you from the Company (which includes a net decrease in your share of the Company's nonrecourse financing with respect to the Company) in any taxable year in excess of the amount of your adjusted basis in your Interests immediately before the distribution must be treated on your own federal income tax return as gain realized by you from the sale or exchange of your Interests.

**An investment in the Company may cause you to pay alternative minimum tax.** You and the other investors will receive a share of the Company's alternative minimum tax preference and adjustment items, such as accelerated depreciation deductions on tangible personal property, passive activity losses and interest deductions. Thus, you may be subject to alternative minimum tax liability as a result of your investment in the Company in addition to your regular federal income taxes, depending primarily on your particular federal income tax circumstances in each year during the Company's term.

**You likely will be subject to state or local taxes as a result of investing in the Company.** In addition to federal income taxes, you likely will be subject to state and local income taxes and tax return filing requirements in the state of your residence and in some or all of the various states and jurisdictions in which the Company does business or owns real estate. If so, you will be subject to penalties for failure to comply with those requirements. Although the Company will report to you the tax information concerning your investment in the Company that you need to file your tax returns, you are responsible for filing all of your own federal, state and local tax returns. The Company has not obtained an opinion of counsel regarding the state or local tax consequences of an investment in the Company.

**Your tax benefits from an investment in the Company are not contractually protected.** An investment in the Company does not give you any contractual protection against the possibility that part or all of the intended tax benefits of your investment will be disallowed by the IRS. No one provides any insurance, tax indemnity or similar agreement for the tax treatment of your investment in the Company. You have no right to rescind your investment in the Company, or to receive a refund of any of your investment in the Company, if a portion or all of the intended tax consequences of your investment in the Company are ultimately disallowed by the IRS or the courts.

**Foreign investors in the Company will be subject to U.S. tax withholding, may be required to file U.S. tax returns and generally will be treated as tax-exempt members.** The Company generally will be required to withhold federal income tax on the income and gain that the Company allocates to foreign investors, whether or not corresponding cash distributions are made to them. If

9

DocuSign Envelope ID: 67883DD9-AD39-4D18-906A-76C354C5C6F3

too much tax is withheld, then foreign investors will have to file U.S. income tax returns to seek a reimbursement. Also, foreign investors generally will be treated as tax-exempt Members for federal income tax purposes.

**Changes in the law may eliminate or reduce tax benefits of the Company**. The present federal income tax treatment of an investment in the Company may be modified by legislative, judicial or administrative action at any time, and the changes may be retroactive. Future revisions in federal income tax laws and their interpretations could reduce or eliminate any tax advantage to you of an investment in the Company.

### Investment by Tax-Exempt Investors

**General.** While the Interests sold in this offering may be acquired by various tax deferred retirement plans, including any pension, profit sharing, Keogh (HR 10) plan or other employee retirement benefit plans qualified under Section 401(a) of the Code, or any IRA qualified under Code Section 408, referred to collectively as a **"Qualified Plan"** or **"Qualified Plans,"** the purchase of the Interests by such Qualified Plans, however, may not be appropriate. Before purchasing Interests, the trustee or other responsible fiduciary of a plan contemplating investment should consider: (a) whether the Qualified Plan is considered an employee benefit plan subject to certain fiduciary standards of the Employee Retirement Income Security Act of 1974, or **"ERISA"**; (b) whether the investment is in accordance with the documents and instruments governing such Qualified Plan; (c) whether the investment will result in unrelated business taxable income to the Qualified Plan; (d) whether the investment provides sufficient distributions to permit benefit payments to be made as they become due; (e) whether the acquisition of Interests constitutes a "prohibited transaction" under Section 4975(c) of the Code; (f) whether the investment is prudent, since no public market is expected to develop in which the Interests may be sold or otherwise transferred; and (g) whether the investment is appropriate for the Qualified Plan with respect to the Qualified Plan's overall investment policy and composition and diversification of its portfolio. Therefore, it is recommended that, before purchasing Interests, trustees or other responsible fiduciaries of Qualified Plans consult with their own legal counsel. The cost of obtaining such advice should be taken into account in evaluating the investment.

**If you are an IRA or other tax-exempt investor, then you will receive unrelated business taxable income from the Company, and your share of the Company's cost recovery deductions or tax losses may be limited or suspended.** Most of the income and gain generated by the Company will constitute "unrelated business taxable income" ("UBTI") to tax-exempt Members such as IRAs and pension plans, depending primarily on the extent to which borrowings were made to further the activities of the Company. If a tax-exempt charitable remainder trust is allocated any UBTI from the Company in a taxable year, then all of its otherwise non-taxable income for that year will be subject to tax. Finally, your status as a tax-exempt Member may result in your share of the Company's cost recovery deductions or tax losses being limited or suspended in any taxable year.

**You are urged to seek advice based on your particular circumstances from an independent tax adviser regarding the tax consequences to you of an investment in the Company.**

EXHIBIT C

## INVESTMENT AGREEMENT

**THIS INVESTMENT AGREEMENT** (the "**Agreement**") is made as of February 4th, 2021 (the "**Effective Date**"), by and between Sky Holdings, LLC, a Delaware limited liability company (the "**Company**") at 10250 Constellation Blvd., Suite 1750, Los Angeles, California 90067, and **Berritto Enterprises LLC** (the "**Investor**") at **11 Danton Lane N, Lattingtown, NY 11560**.

## RECITALS

**WHEREAS**, reference is hereby made to Company's Operating Agreement dated June 23, 2020 ("**Operating Agreement**"), for which a signed and executed copy is required for Company membership; and

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, receipt and sufficiency of which are hereby acknowledged, Company and Investor agrees as follows:

## TERMS

1. **Capital Investment.**

   a. Investor agrees to invest **One Million** Dollars (**$1,000,000** USD) into Company, (the "Capital Investment").

   b. In return, Company will grant a **three point three three three** percent (**3.333**%) equity ownership interest in Company (the "Ownership Share") which will represent 50.000% of the equity in the Property (as defined below).

   c. The initial membership interests of the members will be reflected in the Operating Agreement for the Company.

   d. The funds raised from this offering will be directly used to acquire, own, operate, and eventually sell a 50.000% share of the equity of EHT (Eagle Hospitality Trust, a public lodging REIT), which will become privatized as a part of this investment process, and which consists of an eighteen-hotel U.S. portfolio of properties (the "**Property**").

   e. The Capital Investment will be deposited into an interest-bearing secure bank account and any interest earned on such account may be used by the Company toward costs and expenses (including, but not limited to, legal, accounting and asset management costs and expenses) incurred in connection with this offering and the formation of the Company.

f.  If this transaction is not completed, all funds raised by the Company will be returned to the applicable investors, together with any interest remaining on such funds following the payment of costs and expenses as defined in Section 1.e.

g.  The Company is obtaining acquisition loans in an aggregate amount of approximately $475,000,000 in order to acquire the Property.

h.  The terms of the Investment are set forth in the Operating Agreement for the Company, a copy of which has been or will be provided separately to Investor. The Company's acceptance of the Capital Contribution will be conditioned on Investor entering into the Operating Agreement and agreeing to be bound by all of its terms.

i.  The Operating Agreement for the Company will name Howard Wu and Taylor Woods as manager of the Company (the "Managers") with oversight over all Company decisions in entering into and managing Company strategy, direction, communication, acquisitions, dispositions, etc.

j.  Howard Wu and Taylor Woods, via an affiliate entity, will also serve as Asset Manager of the Property and will be responsible for monitoring third parties, providing operational oversight, the collection, assimilation and distribution of financial and performance data, the planning and approval of capital expenditures, regular forecasting, budgeting, and planning on an annual and monthly basis, etc. and will be compensated as Asset Manager a typical market-based fee for asset management services, and is anticipated to be 2% of revenues.

2.  **Membership Equity.**

a.  Investor's Capital Contribution shall be recorded in Company's documents, including the Operating Agreement, and shall entitle Investor to all profits and losses, rights and obligations as a member of Company as outlined in the Company's Operating Agreement. Investor shall be responsible for his/her own taxes on any distributions made by Company.

3.  **Distributions**.

a.  Upon any Distribution owing to the Capital Investment to Company, Company shall promptly transfer the Distribution received to Investor.

b.  Any Interests and/or Distributions shall be remitted to Investor's designated bank account.

4.  **Profits and Losses**.

a. For accounting and tax purposes, Profits and Losses shall be determined on an annual basis. All items of income, gain, loss and deduction of the Company shall be allocated to the members of Company. Subject to the provisions of the Operating Agreement, Profits, Losses and other items of income, gain, deduction and credit shall be allocated to Investor in proportion to Investor's Ownership Share.

5.  **Term and Termination.**

    a. This Agreement shall be effective and binding on the parties as of the Effective Date.

    b. Investor may withdraw voluntarily from the Company in accordance with the terms of the Operating Agreement.

    c. This Agreement shall terminate upon the sale, transfer, exchange, or dissolution of the Company pursuant to the terms of the Operating Agreement.

6.  **Guarantee and Indemnity.**

    a. Company hereby indemnifies Investor of any and all liability or for any of the Company obligations for the Company in general. Investor responsibility or liability will be strictly limited according to the terms of the Operating Agreement.

7.  **Miscellaneous.**

    a. This Agreement may be amended or modified only by a written agreement signed by all of the parties.

    b. No party shall be deemed to have waived any provision of this Agreement or the exercise of any rights held under this Agreement unless such waiver is made expressly and in writing. Waiver by any party of a breach or violation of any provision of this Agreement shall not constitute a waiver of any other subsequent breach or violation.

    c. No party hereto shall have the right to assign its rights or delegates its duties hereunder without the written consent of the other parties, which consent shall not be unreasonably withheld.

    d. If any provision of this Agreement is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable parts had not been included in this Agreement.

    e. This Agreement shall be binding upon and inure to the benefit of the parties and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

f.  The section headings herein are for reference purposes only and shall not otherwise affect the meaning, construction or interpretation of any provision in this Agreement.

g.  The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of California.

h.  Any dispute arising from this Agreement shall be resolved through binding arbitration conducted in accordance with the rules of the American Arbitration Association.

i.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

j.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

*[Signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.


**INVESTOR**:

<u>Berrito Enterprises LLC</u>

BY:          _____

NAME:    <u>Frank Berritto</u>

TITLE:    <u>Managing Member</u>


**COMPANY**:

SKY HOLDINGS, LLC, a Delaware
Limited Liability Company

BY:          _____

NAME:        <u>Taylor Woods</u>

TITLE:        <u>Managing Member</u>

EXHIBIT D

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

# OPERATING AGREEMENT
# FOR
# SKY HOLDINGS, LLC

THE MEMBERSHIP INTERESTS IN SKY HOLDINGS, LLC HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED, OR QUALIFIED WITH THE CORPORATIONS OR SECURITIES COMMISSIONER OF ANY STATE, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF SUCH LAWS. ANY ATTEMPTED TRANSFER OF THE SECURITIES IS RESTRICTED BY SUCH LAWS AS WELL AS RESTRICTIONS DESCRIBED IN THE WITHIN AGREEMENT.

Dated:  JUNE 23, 2020

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

# OPERATING AGREEMENT
## for
# SKY HOLDINGS, LLC

A.    THIS OPERATING AGREEMENT is effective as of June 23, 2020 by and among the individuals and entities identified on the signature pages attached to this Agreement and listed on Exhibit "A" attached hereto (referred to individually as a "Member" and collectively as the "Members").

B.    The Members have formed a limited liability company (the "Company") under the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code) (the "Act") by filing Articles of Organization with the Delaware Secretary of State.

C.    The Members enter into this Agreement to form and provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

## ARTICLE I:

## ORGANIZATION

**1.1. Name.** The name of the company shall be **Sky Holdings, LLC** (the "Company").

**1.2. Principal Place of Business.** The Company's principal place of business shall be at 10250 Constellation Blvd. #1750, Los Angeles, CA 90067.

**1.3. Purpose.** The purpose of the Company is to engage in and conduct all lawful businesses, activities or functions, and to carry on any other lawful activities in connection with or incidental to the foregoing, as the Member(s) in their discretion shall determine.

**1.4. Registered Agent.** Taylor Woods is the Company's initial registered agent. The registered office is 10250 Constellation Blvd., Suite 1750, Los Angeles, CA 90067.  The Manager(s) may from time to time change the company's agent for service of process.

**1.5. Term.** The term of the Company commences on June 23, 2020 and shall continue until dissolved pursuant to this Agreement.

**1.6. Limitation of Liability.** The liability of each Member and each employee of the Company shall be limited to the fullest extent provided by law.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

**1.7. Names and Addresses of Members.** The Members' names and addresses are attached as Exhibit A to this Agreement.

**1.8. Fiscal Year.** The fiscal year of the Company shall end on December 31, 2020.

## ARTICLE II:

### MEMBERSHIP INTERESTS, VOTING, INDEMNITY

**2.1. Members.** The Members are those identified in Exhibit A. For all purposes hereunder, references to Exhibit A shall mean Exhibit A as may be modified from time to time to reflect changes in Members, Units and contributions.

**2.2. Classification of Membership Interests.** There shall be only one class of membership and no Member shall have any rights or preferences in addition to or different from those possessed by any other Member except as specifically provided for in Article V. Members shall have the right and power to appoint, remove, and replace Manager(s) and officers of the Company to the extent permitted under Article III and the right to Vote on all other matters with respect to which this Agreement requires or permits such Member action. Each Member shall Vote in proportion to the Member's Percentage Voting Interest ("PVI") as of the governing record date, determined in accordance with Section 2.3. If a Member has assigned all or part of the Member's Economic Interest to a Person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the PVI that the Assigning Member would have had, if the assignment had not been made. The PVI shall be calculated by dividing the individual Member's Voting Capital by the total Voting Capital. Each membership unit issued shall be referred to as a "Unit." The membership interests are included in Exhibit A.

**2.3. Percentage Ownership.** The percentage ownership shall be calculated by combining the total of a Member's Voting Capital and dividing the sum by the total of all the Members' Voting Capital. The initial percentages are included in Exhibit A. The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager(s) or by a Majority of Members; provided that such record date shall not be more than sixty (60), or less than five (5) days prior to the date of the meeting or such distributions, as the case may be, and not more than sixty (60) days prior to any other action.

**2.4. Membership Votes**. The Members shall vote upon all matters upon which the Members have the right to in proportion to their PVI. The Members may act only with majority-in-interest. For purposes of this Agreement, a "majority-in-interest" shall mean consent or approval of those Members holding a majority (51% or more) of the Units eligible to vote on the respective matter.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

**2.5. Quorum.** The Members holding more than 50% of the Voting Capital in the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of the Voting Members.

**2.6. Delegation.** The Members may delegate their powers but not their responsibilities, including voting, to officers or agents or employees of the Company.

**2.7. Transfer.** No Member may transfer any interest without the consent of a majority-in-interest of the Members (excluding the proposed transferor and transferee).

**2.8. New Members.** New or additional members may be admitted at any time by affirmative vote of a majority-in-interest of the Members.

**2.9. Indemnification.** No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company.  Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 2.9.  This Section 2.9 supersedes any authority granted to the Members pursuant to the Act.

**2.10. Waiver of Fiduciary Duty.** The Members acknowledge and agree that they shall not owe any fiduciary duty towards each other and each hereby waives any such fiduciary duty that may exist (whether express or implied) under law.


## ARTICLE III:

### MANAGEMENT

**3.1.** The Company shall be managed by Howard Wu and Taylor Woods (the "Managers").

> Howard Wu and Taylor Woods
> 10250 Constellation Blvd., Suite 1750
> Los Angeles, California 90067

**3.2.** The Managers shall be responsible for all day-to-day decisions affecting the Company. The Managers may, but need not, be Members.  If any of the Managers ceases to serve as a Manager (whether due to death, disability, dissolution or otherwise), then the remaining Manager(s) shall have all of the management power and authority of the Manager(s) as set forth in this Agreement.  Except as otherwise

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

provided in this Agreement, all decisions concerning the management of the Company's business shall be made by the unanimous Vote of the Managers, and the Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities with respect to the management of the Company's business, property and affairs on such basis and in such manner as determined by the Managers.

**3.3.** All Major Decisions of the Company shall require the unanimous approval of Howard Wu and Taylor Woods as Managers prior to approving any Major Decisions on behalf of the Company, as well as approval by a Majority of Members. In the event of any dispute between Howard Wu and Taylor Woods that prevents Howard Wu and Taylor Woods from reaching an unanimous decision with respect to any Major Decisions of the Company requiring the unanimous approval of Howard Wu and Taylor Woods, said dispute shall be resolved by submission to binding arbitration in Los Angeles, California using applicable arbitration procedures of JAMS located in Los Angeles County, California in accordance with its rules and procedures regarding commercial disputes.

**3.3.** The Managers shall receive compensation in the amount approved by a majority-in-interest of the members.

**3.4.** It is acknowledged that the Manager(s) have other business interests to which the Managers devote part of the Managers' time. The Managers shall devote to the Company such time as may be reasonably necessary for the proper performance of all duties hereunder and shall be bound by the duty of good faith and fiduciary duty in its dealings with the Company and the Members, but the Managers shall not be required to devote full time to the performance of such duties. Nothing in this Agreement shall be deemed to restrict in any way the rights of the Managers or any Member, or of any Affiliate of the Mangers or any Member, to conduct any other business or activity whatsoever, and the Managers or any Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of the Managers or any other Member or the Managers or Member's Affiliates.

**3.5.** The Managers shall preside at all meetings of Members. The Managers may provide for additional officers of the Company and shall establish the powers and duties of all other officers and the compensation of all Company officers, provided that such powers and duties are consistent with the authority granted to the Managers in this Agreement. The signature of any Manager shall be necessary and sufficient to convey title to any Property owned, either directly or indirectly through one or more entities, by the Company or to execute any promissory notes, trust deeds, mortgages or other

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

instruments of hypothecation, or to execute any other documents or instruments approved by the Managers, and all of the Members agree that a copy of this Agreement may be shown to the appropriate parties in order to confirm the same, and further agree that the signature of a Manager shall be sufficient to execute any documents necessary to effectuate this or any other provision of this Agreement.

**3.6.** The Managers shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

**3.7.** All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Managers. Withdrawal from such accounts shall require the signature of a Manager, or such other Person or Persons as the Managers may designate.

**3.8.** In the event that a majority vote of the Managers cannot be achieved on any matter requiring such a vote pursuant to this Article, then such impasse shall be broken by the Vote of a Majority of Members.

**3.9.** The Managers may, on behalf of the Company and with the consent of a Majority of the Members, purchase or provide goods or services from the Managers, any Member and/or any of their Affiliates; provided that the amounts paid for, and other terms relating to the furnishing of, such goods or services may not be materially less advantageous to the Company than the amounts and terms for and upon which similar goods or services could be obtained or furnished in the same geographic area to or from good quality corporations or business enterprises which are not the Managers, a Member and/or their Affiliates.  The foregoing authorization shall also apply to a sale or disposition of substantially all of the Company's assets to the Managers, any Member and/or any Affiliate prior to or following dissolution or upon winding-up or liquidation of the Company.  Amounts paid to the Managers, any Member and/or any of their Affiliates either for goods or services in transactions authorized pursuant to this Section 3.9 shall be treated for all purposes as amounts paid to non-Members and any compensation or reimbursement received by any Member from any such Affiliate shall belong to it and not to the Company.

**3.10.** The Managers shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Managers, except for fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement.  The Company shall indemnify the Managers for any act performed by the Manager(s), except for fraud, gross negligence, willful misconduct or an intentional breach of this Agreement.

**3.11.** The Company shall reimburse the Manager for any and all reasonable expenses incurred or advanced by the Manager on behalf of the Company in connection with the business and affairs of the Company.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

## ARTICLE IV:

## CAPITAL CONTRIBUTIONS

**4.1. Initial Contributions.** The Members initially shall contribute to the capital of the Company as the Member's initial Capital Contribution the money and property specified on the Subscription Agreement signed by each Member. The contribution of the capital as described in each Members' Subscription Agreement is a condition of the issuance of the respective Units indicated in Exhibit A. The contribution percentages and totals in the schedule shall be adjusted as they change to reflect the admission of new Members or any other event.

**4.2. Additional Contributions.** The Managers do not anticipate that any additional Capital Contributions will be required from the Members in addition to the initial Capital Contributions made by the Members in accordance with Section 4.1 above. However, if the Managers reasonably determines from time to time that additional cash capital contributions are needed to carry out the purposes of the Company (in connection with making such determination the Managers will take into account any projected Available Cash Flow which may be available and the availability of additional financing to pay for any such items), the Managers shall deliver written notice to the Members as to the amount of additional capital that is needed. Within thirty (30) days after receipt of such written notice, each Member may, but without any obligation to do so, make additional cash Capital Contributions to the Company in an amount equal to the product obtained by multiplying its Capital Percentage Interest by the additional capital amount that the Managers reasonably determined is necessary to carry out the purposes of the Company.

**4.3. Interest.** The Members are not entitled to interest or other compensation on their capital contributions except as expressly provided in this Agreement.

**4.4. Return.** No Member has any right to any return of capital or other distribution except as expressly provided in this Agreement. No Member has any drawing account in the Company.

## ARTICLE V:

## ALLOCATION OF PROFITS AND LOSSES

**5.1. Profits/Losses.** For accounting and tax purposes, net profits or net losses shall be determined on an annual basis. Profits and losses will be distributed in proportion to each Member's relative proportion of total capital in the Company, as set forth in Exhibit A.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

**5.2. Distributions.** The Members shall distribute funds annually or, if determined as necessary by the majority of the Members, at more frequent intervals. No Member has the right to demand or receive distribution in any form other than money. No Member may be compelled to accept distribution of assets in lieu of money, except on dissolution and winding up of the Company.

## ARTICLE VI:

## REIMBURSEMENT AND EXPENSES

**6.1. Organization Expenses.** All expenses in connection with the management and organization of the Company will be paid by the Company.

**6.2. Legal and Accounting Services.** The Company may obtain legal and accounting services to the extent reasonably necessary.

## ARTICLE VII:

## RECORDS AND REPORTING

**7.1. Books.** The Managers shall maintain complete and accurate books and records in accordance with generally accepted accounting principles.

**7.2. Records.** Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Managers shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member.

Financial books and records of the Company shall be kept on the method of accounting adopted by the Company for federal income tax purposes. The financial statements of the Company shall be prepared in accordance with standard accounting principles and shall be appropriate and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

The Company shall maintain at its principal office the following: (a) the full name and last known business or residence address of each Member; (b) records detailing all

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

capital accounts, including entries for contributions and distributions, ownership interest, percentage ownership, and voting interests; (c) a copy of the certificate of formation of the Company and any and all amendments; (d) copies of all federal ,state, and local income tax or returns and reports for the six most recent taxable years; (e) a copy of this Agreement and any amendments; (f) copies of financial statements of the Company for the six most recent fiscal years; (g) the books and records as related to the affairs of the Company; and (h) true and full information regarding the status of the business and financial conditions of the Company, including the amount of cash and description of the agreed value of any property or services contributed or that will be contributed by Members.

**7.3. Accountings.** At the close of each fiscal year, the Managers shall make a full and accurate accounting of the affairs of the Company, including a balance sheet, a profit and loss statement, and a statement of the Members' equity showing the respective capital accounts and distributions, if any, and any other information necessary for a complete and fair presentation of the financial condition of the Company.

**7.4. Inspection.** Each Member has the right, on reasonable request related to their interest as a Member, to: (a) inspect and copy during normal business hours any of the Company's records described above; (b) obtain from the Company promptly after becoming available a copy of the Company's federal, state, and local income taxes and returns for each fiscal year.

**7.5. Partnership for Tax Purposes.** The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state or local income tax purposes, and that the Members and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE VIII:

## DISSOLUTION AND LIQUIDATION

**8.1. Dissolution.** The Company shall be dissolved upon the occurrence of any the following:
a. Approval by a majority-in-interest of the Members.
b. Bankruptcy, death, dissolution, expulsion, incapacity, or withdrawal of any Member unless a majority-in-interest of the remaining Members gives written consent to continue.
c. As required by law or judicial decree.

**8.2. Winding Up and Distribution.** Upon dissolution of the Company, the Manager(s) who have not wrongfully dissolved the Company or, if there is no such Manager, one or

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

more Members elected by a majority-in-interest shall be the liquidating Member(s) ("Liquidating Member"). The Liquidating Member winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. The Liquidating Member shall wind up the Company's affairs, liquidate the property and assets, and terminate any remaining business. The Liquidating Member(s) shall give a full accounting of the assets and liabilities. The assets and liabilities may be liquidated by selling the assets and distributing the net proceeds. The proceeds of the liquidation shall be distributed in this order: (1) the expenses of liquidation; (2) debts and liabilities of the Company (including debts of the Company to the Members or affiliates); (3) a reserve for contingent or unforeseen liabilities or obligations to third parties (to be held in escrow by an agent chosen by the Liquidating Member); (4) to the Members in proportion to the Units owned by each Member relative to the total of all issued Units.

**8.3. Member Investment.** Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.

## ARTICLE IX:

### INDEMNIFICATION

**9.1.** None of any Member, any Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them shall be liable, responsible or accountable in damages or otherwise to the Company, any third party or to any other Indemnified Party (as defined below) for any act or omission performed or omitted to be performed by any of them to the extent the Person performing such act or responsible for such omission reasonably believes such act or omission was within the scope of the authority conferred upon such Person (or its Affiliates) by this Agreement, except for fraud, willful misconduct or material breach of this Agreement.  In addition, no Member shall have any personal liability for any guaranty provided by the Company, Urban Commons, Taylor Woods or Howard Wu.  In any threatened, pending, or completed action, suit or proceeding against a Member, a Manager or their respective Affiliates or the respective directors, officers, members, partners, employees, representatives, and managers of each of them (collectively, "Indemnified Parties", and each individually, an "Indemnified Party") relating to Company business or the furtherance thereof by an Indemnified Party, including, but not limited to, guarantying any repayment or completion obligations of the Company, each Indemnified Party shall be fully protected and indemnified and held harmless by the Company against all liabilities, obligations, losses, damages, penalties, actions,

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable attorneys' fees, costs of investigation, fines, judgments and amounts paid in settlement, actually incurred by such Indemnified Party by virtue of its status as an Indemnified Party (collectively "Liabilities"), other than Liabilities resulting from the fraud, willful misconduct or material breach of this Agreement of or by such Indemnified Party. The indemnification provided by this Section 9.1 shall be recoverable only out of the assets of the Company, and no Member or Manager shall have any personal liability (or obligation to contribute capital to the Company) on account of the Company's indemnification.

**9.2.** This Agreement and the rights and obligations of the parties hereto shall be governed by the laws of the State of California. Any controversy, dispute, or claim of any nature arising out of, in connection with, or in relation to the interpretation, performance, enforcement or breach of this Agreement, including any claim based on contract, tort or statute (collectively, a "Dispute"), that cannot be resolved by the parties within thirty (30) days shall first be submitted to mediation between the parties. In the event that such mediation does not resolve the Dispute within ten (10) business days, the Dispute shall be resolved at the written request of any party to this Agreement by binding arbitration using applicable arbitration procedures of JAMS located in Los Angeles County, California. The parties shall attempt to designate one arbitrator from JAMS. If they are unable to do so within thirty (30) days after written demand therefor, then JAMS shall designate an arbitrator. The arbitration shall be final and binding, and enforceable in any court of competent jurisdiction. The arbitrator shall award attorneys' fees and costs to the prevailing party and charge the cost of arbitration to the party which is not the prevailing party. Notwithstanding anything to the contrary contained herein, this Section 9.2 shall not prevent any party from seeking and obtaining equitable relief on a temporary or permanent basis, including, without limitation, a temporary restraining order, a preliminary or permanent injunction or similar equitable relief, from a court of competent jurisdiction located in the State of California (to which all parties hereto consent to venue and jurisdiction) by instituting a legal action or other court proceeding in order to protect or enforce the rights of such party under this Agreement or to prevent irreparable harm and injury. The court's jurisdiction over any such equitable matter, however, shall be expressly limited only to the temporary, preliminary, or permanent equitable relief sought; all other claims initiated under this Agreement between the parties hereto shall be determined through final and binding arbitration in accordance with the terms of this Section 9.2.

**9.3. Insurance.** The Company shall have the authority to purchase and maintain insurance covering any person who is or was a Member or agent of the Company against any liability asserted against the person arising out of his/her status as a Member or agent of the Company, regardless of whether the Company would have the authority to indemnify such person against liability under this Agreement or applicable law.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

### ARTICLE X:

### CONFIDENTIAL INFORMATION

**10.1. General.** Each Member and the Manager hereby acknowledges that the Company has or may have, utilizes or may utilize, may develop and/or may acquire proprietary intellectual property, trade secrets, and other confidential information not generally known to the public (collectively, "Confidential Information"). Each Member and the Manager acknowledges that such Confidential Information is a special, valuable, and unique asset of the Company and agrees that it will not use any such Confidential Information for its own benefit or for the benefit of any person or entity with which it may be associated in any manner except the Company or its Affiliates. Except (i) in connection with maintaining and reporting its investment in the Company as reasonably required in its own operation, (ii) in connection with the responsibilities hereunder or operation of the Company and for the benefit thereof, or (iii) as may be required by law or court order (in which event the Member or the Manager so required shall promptly notify the Company, as the case may be, to give the respective entity an opportunity to seek an appropriate protective order), each Member and the Manager agrees that it will not disclose any Confidential Information to any Person unless such information is previously known, was disclosed on a non-confidential basis or was disclosed by the Company in a manner intended to not be confidential. "Affiliate" of a Party means (1) any corporation, partnership, trust or other entity controlling, controlled by or under common control with such Party; (2) any executive officer, director, trustee or general partner of any Party described in (1) above; or (3) any spouse, lineal ancestor, lineal descendant or member of the household of such Party. For purposes of this section, "control" shall mean the control or ownership of fifty percent (50%) or more of the voting securities in the Party referred to.

**10.2. Member Contributions.** Each Member and the Manager further acknowledges that it may contribute ideas, knowledge, know-how and, potentially, Confidential Information of such disclosing Member or the Manager to the Company, the employees, agents or contractors of the Company. Each disclosing Member or the Manager shall retain ownership of such Confidential Information but grants to only the Company, not to the individual(s) to whom the information was disclosed in his/her respective personal capacity(ies), the limited right to use such Confidential Information solely and exclusively for the benefit of the Company, and not any individual Member other than the disclosing Member; and each Member and the Manager other than the discloser promises and agrees to not use Confidential Information of a disclosing Member or the Manager for any purpose whatsoever except in connection with the Company and except with the written consent of both the disclosing Member and the Company. For purposes of this Section X, all references to the Company shall include its Affiliates.

**10.3. Exceptions.** Notwithstanding the foregoing, Confidential Information shall not include any information which a Member or the Manager can show, by contemporary documentation, (i) is now or later becomes available in the public domain without

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

breach of this Agreement by the Member or the Manager, (ii) was in the possession of the Member or the Manager prior to disclosure to the Member or the Manager by the Company, (iii) was received from a third party without breach of any nondisclosure obligations to the Company or otherwise in violation of the Company's rights, or (iv) was developed by the Member or the Manager independently of any Confidential Information received from the Company.

## ARTICLE XI:

## REPRESENTATIONS AND WARRANTIES

**11.1. Investment Matters.** Each Member, severally and not jointly, hereby warrants and represents to the Company and to each other Member that (i) such Member is acquiring his, her or its Units solely for investment and not with a view to the distribution or resale thereof or to divide his or its participation with others, (ii) such Member is acquiring his, her or its Units with his, her or its own funds and for his, her or its own account and not on behalf of any other Person, (iii) neither such Member nor any other Person acting on his, her or its behalf has paid any commission or other compensation to any Person in connection with such Member's acquisition of his, her or its Units, and (iv) such Member acknowledges that none of the Units has been registered or qualified under the Securities Act of 1933, as amended from time to time (the "Securities Act"), or any applicable state securities laws, and, in addition to the other restrictions on disposition contained in this Agreement, the Units may not be sold, transferred or otherwise disposed of in whole or in part unless a registration statement under the Securities Act with respect to such Units and qualification in accordance with all applicable state securities laws has become effective, or unless such Member establishes to the satisfaction of the Company that an exemption from such registration and qualification is available.

**11.2. Authorization; No Conflicts; Due Execution and Delivery.** Each person now or hereafter becoming a Party to this Agreement hereby represents and warrants to the Company and each other Party hereto that such person is of legal age and is duly authorized to execute, deliver and perform this Agreement, and such execution, delivery and performance will not breach, conflict with, give rise to a default under, or violate any law, rule, regulation or order applicable to such person or by which such person is bound, nor any material contract or agreement to which such person is a party or by which such person is bound. Each person executing or delivering this Agreement in a representative capacity on behalf of another person represents and warrants to the Company and each Party hereto that such representative is duly authorized to do so.

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

## ARTICLE XII:

## ATTORNEY-IN-FACT AND AGENT

**12.1.** Each Member, by execution of this Agreement, irrevocably constitutes and appoints each Manager and any of them acting alone as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, and deliver, and to file or record in any appropriate public office: (a) any certificate or other instrument that may be necessary, desirable, or appropriate to qualify the Company as a limited liability company or to transact business as such in any jurisdiction in which the Company conducts business; (b) any amendment to the Company's Articles or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved by the Members in accordance with the provisions of this Agreement; (c) any certificates or instruments that may be necessary, desirable, or appropriate to reflect the dissolution and winding up of the Company; and (d) any certificates necessary to comply with the provisions of this Agreement. This power of attorney will be deemed to be coupled with an interest and will survive the Transfer of the Member's Economic Interest. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by a Manager. This power of attorney is a limited power of attorney and does not authorize any Manager to act on behalf of a Member except as described in this Article XII.

## ARTICLE XIII:

## MISCELLANEOUS

**13.1. Dispute Resolution.** Any dispute arising out of or related to this Agreement that the Members are unable to resolve by themselves shall be settled by arbitration in the State of California in accordance with the rules of the American Arbitration Association. The written decision of the arbitrator(s), as applicable, shall be final and binding on the Members. Judgment on a monetary award or enforcement of injunctive or specific performance relief granted by the arbitrator(s), or to enforce this arbitration agreement, may be entered in any court having jurisdiction over the matter without the requirement of a bond.

**13.2. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Members and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns.

**13.3. Severability.** If any provision of this Agreement is held to be invalid, illegal or unenforceable in whole or in part, the remaining provisions shall not be affected and

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

shall continue to be valid, legal and enforceable as though the invalid, illegal or unenforceable parts had not been included in this Agreement.

**13.4. Governing Law.** The terms of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, not including its conflicts of law provisions.

**13.5. Further Assurances.** At the written request of one Member, the other Members shall execute and deliver such other documents and take such other actions as may be reasonably necessary to effect the terms of this Agreement.

**13.6. Headings.** The section headings herein are for reference purposes only and shall not otherwise affect the meaning, construction or interpretation of any provision in this Agreement.

**13.7. Entire Agreement.** This Agreement contains the entire understanding between the Members and supersedes and cancels all prior agreements of the Members, whether oral or written, with respect to such subject matter.

**13.8. Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together, shall constitute one and the same document.

**13.9. Amendment.** This Agreement may be amended or modified only by a written agreement signed by all of the Members.

**13.10. Notices.** Any notice or other communication given or made to any Member under this Agreement shall be in writing and delivered by hand, sent by overnight courier service or sent by certified or registered mail, return receipt requested, to the address in Exhibit A or to another address as that Member may subsequently designate by notice and shall be deemed given on the date of delivery. For a notice to be valid, an email copy shall accompany each of the foregoing modes of noticing a Party. An email notice, by itself, shall suffice as notice at such time as the sender receives a receipt acknowledgment or the recipient replies, directly or indirectly, to such notice.

**13.11. Waiver.** No Member shall be deemed to have waived any provision of this Agreement or the exercise of any rights held under this Agreement unless such waiver is made expressly and in writing. Waiver by any Member of a breach or violation of any provision of this Agreement shall not constitute a waiver of any other subsequent breach or violation.

*[Signature Pages Follow]*

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered as of the date first written above.

**MANAGERS:**

By:_____
      Taylor Woods, Manager

By:_____
      Howard Wu, Manager

DocuSign Envelope ID: FB2FFDB6-C51E-4DB3-88D2-4B9BFF60F5FC

**MEMBERS:**

Printed Name of Member

Signature of Member

Berrito Enterprises LLC   MANGING MEMBER: Frank Berritto

_Berrito Enterprises LLC MANGING MEMBER: Fr_       2/3/2021
—988C5A944CE243C

Printed Name(s) and Title(s) or
Capacity(ies) of any Officer(s)
Partner(s) or Agent(s) Acting on
Behalf of Member

Signature(s) of Any Officer(s),
Partner(s) or Agent(s) Acting
on Behalf of Member

By:_____Frank Berritto_____

By:_____

Title:_____Managing Member_____

EXHIBIT E

# The Sklavos Law Group PC

375 NORTH BROADWAY, SUITE 208
JERICHO, NEW YORK 11753

August 27, 2021

Via Overnight Mail and via Email
Sky Holdings. LLC
Taylor Wood, Howard Wu, Managing Members
8424 Santa Monica Boulevard, Suite A232
West Hollywood, CA 90069

Re: Berritto Enterprises LLC and Sky Holdings LLC

Dear Mr. Woods and Mr. Wu:

As you have been previously informed, this office represents Berritto Enterprises LLC.
We previously notified you of our demand to inspect books and records by email and
overnight mail. You failed to inform your membership of moving the offices of Sky
Holdings, LLC. A supplemental notice is hereby given and new notice herein.

Pursuant to the Sky Holdings, LLC Operating agreement section 7.4 my client has the
right to inspect and copy the Company's records. Pursuant to the Operating Agreement
section 9.2, the parties' Operating Agreement is governed by the laws of California.

Please be informed that pursuant to California Corporations Code § 17704.10

Each member has the right to inspect and copy the LLC's records during normal hours of
operation. Any request or inspection may be made by the requesting person or the
person's representative, agent, or attorney.

Please also note that section 13.4 of your agreement states that the terms of the operating
agreement shall be governed by the laws of the State of Delaware.

As such, please be informed that my client also demands to inspect and copy the LLC's
records during normal hours of operation pursuant to Section 18-305 of the Delaware
Limited Liability Company Act (the "LLC Act"),

An attorney for Berritto Enterprises, LLC (Peter Bronstein, Esq.) shall appear at your
offices at **approximately 1:30pm PST on August 31, 2021** to perform the above
inspection. I previously notified you of this request by email on Wednesday August 18,
2021.

Please have the following ready:

A. Minutes of any meeting of the Managers, or members and records of action taken by
the managers or membership or a committee of the LLC without a meeting;

B. Accounting records of the LLC, including but not limited to all bank records (including all deposits), invoices, receipts, tax returns, certified financial reports and cash transactions; and

C. The record of members, including, names, addresses, emails and phone numbers (not provided with the executed operating agreement).

D. All Agreements.

E. All records of compensation to the managers

F. All records of membership votes awarding compensation to the managers.

All demands are for records from 2020 to present.

This demand is made in good faith and for proper purpose because there has been no reporting nor accounting to the requesting member since the purchase of interest on February 3, 2021. In addition, the requesting member is unaware of any meetings taking place since the purchase of his interest on February 3, 2021. This demand is made for the proper purpose of learning the financial condition of the membership, the number of other members in the LLC the status of the investments collected by the LLC and any expenditures made by the LLC since formation.

Please note that your failure to provide these records will be deemed a material breach of the operating agreement, and my client will seek immediate judicial intervention. If you intend to refuse access, please advise the undersigned in writing. Thanking you for your attention to this matter, I remain,

Very truly yours,

Alexander E. Sklavos

c.c. Berritto Enterprises, LLC
c.c. Peter Bronstein, Esq.

EXHIBIT F

# The Sklavos Law Group PC

375 NORTH BROADWAY, SUITE 208
JERICHO, NEW YORK 11753

August 23, 2021

Sky Holdings. LLC
Urban Commons Managing Member
10250 Constellation Blvd #1750
Los Angeles, CA 90067
Attn. Managing Members

Re: Berritto Enterprises LLC and Sky Holdings LLC

Dear Sir or Madam:

As you have been previously informed, this office represents Berritto Enterprises LLC.
Pursuant to the Sky Holdings, LLC Operating agreement section 7.4 my client has the
right to inspect and copy the Company's records. Pursuant to the Operating Agreement
section 9.2, the parties' Operating Agreement is governed by the laws of California.

Please be informed that pursuant to California Corporations **Code § 17704.10**

Each member has the right to inspect and copy the LLC's records during normal hours of
operation. Any request or inspection may be made by the requesting person or the
person's representative, agent, or attorney.

Please also note that section 13.4 of your agreement states that the terms of the operating
agreement shall be governed by the laws of the State of Delaware.

As such, please be informed that my client also demands to inspect and copy the LLC's
records during normal hours of operation pursuant to Section 18-305 of the Delaware
Limited Liability Company Act (the "LLC Act").

An attorney for Berritto Enterprises, LLC (Peter Bronstein, Esq.) shall appear at your
offices at **approximately 4:00pm PST on August 25, 2021** to perform the above
inspection. I previously notified you of this request by email on Wednesday August 18,
2021.

Please have the following ready:

A. Minutes of any meeting of the Managers, or members and records of action taken by
the managers or membership or a committee of the LLC without a meeting;
B. Accounting records of the LLC, including but not limited to all bank records
(including all deposits), invoices, receipts, tax returns, certified financial reports and cash
transactions; and

(516) 248-4000 PHONE
(866) 829-8933 FAX
WWW.SKLAVOSLAW.COM

C. The record of members, including, names, addresses, emails and phone numbers (not provided with the executed operating agreement).

D. All Agreements.

E. All records of compensation to the managers

F. All records of membership votes awarding compensation to the managers.

All demands are for records from 2020 to present.

This demand is made in good faith and for proper purpose because there has been no reporting nor accounting to the requesting member since the purchase of interest on February 3, 2021. In addition, the requesting member is unaware of any meetings taking place since the purchase of his interest on February 3, 2021. This demand is made for the proper purpose of learning the financial condition of the membership, the number of other members in the LLC the status of the investments collected by the LLC and any expenditures made by the LLC since formation.

Please note that your failure to provide these records will be deemed a material breach of the operating agreement, and my client will seek immediate judicial intervention. If you intend to refuse access, please advise the undersigned in writing. Thanking you for your attention to this matter, I remain,

Very truly yours,

Alexander E. Sklavos

c.c. Berritto Enterprises, LLC

B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(For Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>BERRITTO ENTERPRISES LLC, a New York LLC | **DEFENDANTS**<br>URBAN COMMONS LLC, *Shy Holdings LLc*<br>*Taylor Woods and*<br>*Howard Wu* |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Law Office of Peter Bronstein (CA Bar 153611)<br>1999 Avenue of the Stars 11 FL<br>Los Angeles, CA 90067<br>Tel No. (310) 203-2249<br>Email Peterbronz@yahoo.com | **ATTORNEYS** (If Known)<br>**The Bensamochan Law Firm Inc<br>9025 Wilshire Blvd. Suite 215<br>Beverly Hills, CA 90211** |

| **PARTY** (Check One Box Only)<br>[ ] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[X] Creditor    [ ] Other<br>[ ] Trustee | **PARTY** (Check One Box Only)<br>[X] Debtor    [ ] U.S. Trustee/Bankruptcy Admin<br>[ ] Creditor    [ ] Other<br>[ ] Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUES INVOLVED)
**Debtor has same officers and directors and took over $1,000,000 from investor in an affiliated entity**

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) - Recovery of Money/Property**
[X] 11-Recovery of money/property - §542 turnover of property
[ ] 12-Recovery of money/property - §547 preference
[ ] 13-Recovery of money/property - §548 fraudulent transfer
[ ] 14-Recovery of money/property - other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
[ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) - Approval of Sale of Property**
[ ] 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) - Objection/Revocation of Discharge**
[ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) - Revocation of Confirmation**
[ ] 51-Revocation of confirmation

**FRBP 7001(6) - Dischargeability**
[ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
[X] 62-Dischargeability - §523(a)(2), false pretenses,
     false representation, actual fraud
[ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary,
     embezzlement, larceny

(continued next column)

**FRBP 7001(6) - Dischargeability (continued)**
[ ] 61-Dischargeability - §523(a)(5), domestic support
[ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
[ ] 63-Dischargeability - §523(a)(8), student loan
[ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation
     (other than domestic support)
[ ] 65-Dischargeability - other

**FRBP 7001(7) - Injunctive Relief**
[ ] 71-Injunctive relief - imposition of stay
[ ] 72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[ ] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ] 01-Determination of removed claim or cause

**Other**
[ ] SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
[ ] 02-Other (e.g. other actions that would have been brought in state
     court if unrelated to bankruptcy case)

| [ ] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [X] Check if a jury trial is demanded in complaint | Demand $ **1,000,000 plus interest** |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| Debtor  URBAN COMMONS LLC | | BANKRUPTCY CASE NO.<br>2:21-BK-13523-ER |
| DISTRICT IN WHICH CASE IS PENDING<br>**Central District of California** | DIVISION OFFICE<br>**Los Angeles** | NAME OF JUDGE<br>**ERNEST ROBLES** |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>October  6, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Peter Bronstein | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case  Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

B104 (FORM 104) (08/07), Page 2

Other Relief Sought